IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DAVID WILKERSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 11–cv–0265–MJR–SCW |
| | ) |
| JAMES FENOGLIO, SHERRY BENTON, | ) |
| and ROBERT HURFORD, JR., | ) |
| | ) |
| Defendants. | ) |

## REPORT & RECOMMENDATION

**WILLIAMS, Magistrate Judge:**

In April 2011, *pro se* Plaintiff David Wilkerson, an inmate in the Illinois Department of Corrections (IDOC), sued five IDOC officials pursuant to 42 U.S.C. § 1983. Three defendants remain in the case. Wilkerson's allegations stem from an accidental fall in October 2008: he claims the defendants violated his Eighth Amendment rights via deliberate indifference to the injuries sustained in that fall. One defendant—Robert Hurford, Jr.—has moved for summary judgment.

His summary judgment motion **(Doc. 69)** is now before the undersigned magistrate judge. This Report and Recommendation is respectfully submitted to United States District Court Judge Michael J. Reagan pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C). For the following reasons, it is **RECOMMENDED** that Defendant Robert Hurford, Jr.'s Motion for Summary Judgment (**Doc. 69**) be **GRANTED**.

### FACTUAL & PROCEDURAL BACKGROUND[1]

At all times relevant to this lawsuit, Plaintiff David Wilkerson (who was paralyzed before he entered IDOC custody) was a paraplegic inmate incarcerated at the Lawrence Correctional Center.

---

[1] Because this case comes before the Court at the summary judgment stage, all facts are considered in a light most favorable to Wilkerson, the non-movant. **Srail v. Vill. of Lisle**, 588 F.3d 940, 948 (7th Cir. 2009). The Court adopts reasonable inferences and resolves doubts in Wilkerson's favor. **Id.**; **Nat'l Athletic Sportswear, Inc.**, 528 F.3d at 512.

In June 2008, after an initial consultation, Defendant Hurford—a private orthopedic surgeon employed at nearby Carle Physician Group—performed spinal surgery on the Plaintiff. (*See* Pl.'s Aff., Doc. 69-2, 2; Doc. 69-2, 9–11). (Wilkerson had been transferred to Carle from Lawrence). During that surgery, Dr. Hurford debrided some abscesses along Wilkerson's spine, and placed some implants in his back. Wilkerson had a followup appointment in August 2008, at which Dr. Hurford noted Wilkerson reported "that his Tramadol [a painkiller] is giving him some relief, but not like the stronger pain medicine was." (Doc. 69-2, 12).

In October 2008, Wilkerson fell in the shower.[2] In November, at Wilkerson's next visit to Dr. Hurford, he reported the fall, as well as an onset of abdominal and back pain. In patient notes from the November visit, Dr. Hurford indicated that the hardware in Wilkerson's back had failed, and concluded "I think he is a candidate for additional spinal surgery . . ." (Doc. 69-2, 14). According to Hurford's affidavit, "[t]here was no indication to hospitalize [Wilkerson]" during the November visit, since he "was not at risk to develop any additional problems. In fact, [Wilkerson] could fuse without the need for additional reconstructive surgery." (Doc. 69-2, 5).

In December, Wilkerson underwent an MRI at Lawrence County Memorial Hospital, and in January 2009 the hospital performed a CT scan on him. Plaintiff's physician at Lawrence (co-defendant James Fenoglio) mailed copies of those scans to Hurford in February 2009. Hurford called Fenoglio a few days later and recommended (based on his opinion that Wilkerson's fixation had failed) surgery "that extended his fusion to Plaintiff's sacrum and pelvis with iliac screws). At the request of the Lawrence patient manager (who requested that recommendation be faxed in late March 2009), Hurford faxed the recommendation to Lawrence. (Doc. 69-2, 20–21).

---

[2] Wilkerson's claims against the other remaining defendants also stem from alleged deliberate indifference to the injuries he sustained in his October fall.

2

Prison officials approved Wilkerson's followup surgery on April 8, 2009. (Doc. 69-2, 22). The surgery did not occur until May 27 that year. (Doc. 69-2, 23–28). Hurford's notes from the May 27 surgery are part of the record, and (in pertinent part) indicate:

> Patient's previous posterior midline longitudinal incision was used. Skin was incised sharply. Electrocautery was then used. His fusion mass was exposed from L2-S1. The patient had a solid fusion mass from L2-S1. On the left side, his L3 and L4 screws were seen, set screws were removed and then the rod was removed. With upward traction on the L4 screws, there was no motion from L4-S1. Additional [sic], while using a sharp towel clip and pulling on the fusion mass, there was no motion from L4-S1. The screws at L3 and L4 were removed only on the left side. The right-sided screws and left L5 screw was buried in the fusion mass. I decided not to take down the fusion mass to remove these screws since the patient was solidly fused. . . . Because the patient was solidly fused, I judged that he did not need any additional surgery.

Wilkerson filed suit, and on October 11, 2012, Dr. Hurford moved for summary judgment on two theories: (1) that he was not subject to § 1983 liability because he was not acting under the color of state law, and (2) that he was not deliberately indifferent to Wilkerson's serious medical needs. The motion ripened when Wilkerson filed his response on October 17. Having thoroughly reviewed the arguments and the entire record, the undersigned RECOMMENDS as follows.

## SUMMARY JUDGMENT STANDARD

Summary judgment, which is governed by FEDERAL RULE OF CIVIL PROCEDURE 56, is proper only if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. **Dynegy Mktg. & Trade v. Multiut Corp., 648 F.3d 506, 517 (7th Cir. 2011) (citing FED. R. CIV. P. 56(a)).**[3] The party seeking summary judgment bears the initial burden of demonstrating—based on the pleadings, affidavits and/or information obtained via discovery—the lack of any genuine issue of material fact. **Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).** In determining whether a genuine issue of

---

[3] Though Rule 56 was amended in 2010, the amendment did not change the summary judgment standard. **Sow v. Fortville Police Dept., 636 F.3d 293, 300 (7th Cir. 2011).**

3

material fact exists, the Court must view the record in a light most favorable to the nonmoving party. **Id. at 255.**

After a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." **Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).** Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmoving party cannot rely on the pleadings, and must respond with specific facts. **Albeiro v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001). See also Serednyj v. Beverly Healthcare, LLC, 656 F.3d 540, 547 (7th Cir. 2011) ("When a summary judgment motion is submitted and supported by evidence . . . the nonmoving party may not rest on mere allegations or denials in its pleadings")**. A mere scintilla of evidence is insufficient: a party will successfully oppose summary judgment only when it presents definite, competent evidence to rebut the motion. **Albiero, 246 F.3d at 931–32. See also Steen v. Myers, 486 F.3d 1017, 1022 (7th Cir. 2007) ("[S]ummary judgment is . . . the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events") (internal quotation marks omitted)**

In other words, there is "no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party." **Van Antwerp v. City of Peoria, 627 F.3d 295, 297 (7th Cir. 2010). Accord Anderson, 477 U.S. at 248 (material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party).** In its examination of whether a material fact remains for trial, the Court's role is not to evaluate the weight of the evidence, to judge witness credibility, or to determine the truth of the matter. **Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co., 528 F.3d 508, 512 (7th Cir. 2008).**

4

The Court therefore considers the facts in a light most favorable to the non-movant—here, Wilkerson. **Srail v. Vill. of Lisle, 588 F.3d 940, 948 (7th Cir. 2009).** The Court adopts reasonable inferences and resolves doubts in his favor. **Id.; Nat'l Athletic Sportswear, Inc., 528 F.3d at 512.**

## PROPOSED CONCLUSIONS OF LAW

Section 1983 liability is triggered when a person, acting under the color of state law, deprives a plaintiff of rights secured by the Constitution or laws of the United States. **42 U.S.C. § 1983**. It is unclear under Seventh Circuit caselaw whether Hurford is a state actor for the purposes of § 1983. But even assuming he is a state actor, summary judgment is appropriate here, because Hurford was not deliberately indifferent to Wilkerson's serious medical needs, and therefore did not violate Wilkerson's Eighth Amendment rights.

1. **State Actor Analysis**

When a plaintiff brings a § 1983 claim against a defendant who is not a government official or employee, the plaintiff must show that the private entity acted under the color of state law. **Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 822 (7th Cir. 2009).** The showing is an important statutory element because "it sets the line of demarcation between those matters that are properly federal and those matters that must be left to the remedies of state tort law." **Id. at 823.** The ultimate issue in determining whether a person is subject to § 1983 liability is whether the alleged infringement of federal rights is fairly attributable to the state. **Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982).** But, as the Seventh Circuit has recognized, the determination can constitute "one of the more slippery and troublesome areas of civil rights litigation." **Id. (quoting Int'l Soc'y for Krishna Consciousness v. Air Canada, 727 F.2d 253, 255 (2d Cir. 1984)).**

It is clearly-established that § 1983 "state actor" status attaches to a private physician who provides medical care to prisoners at a prison, **West v. Atkins, 487 U.S. 42, 51 (1988)**, or to a physician (private or otherwise) who treats an inmate at a state-owned facility outside a prison, **Rice**

5

*v. Corr. Med. Servs.*, 675 F.3d 650, 671 (7th Cir. 2012) (citing *Youngberg v Romeo*, 457 U.S. 307 (1982)). It is murkier, though, whether a private physician who accepts an inmate for care in an external private facility is a state actor. *See Rice*, 675 F.3d at 672 (noting the Supreme Court has not yet addressed the issue). Though myriad tests exist (*see Rodriguez*, 577 F.3d at 823–24 (classifying the rules from older Supreme Court holdings as "the symbiotic relationship test," "the state command and encouragement test," "the joint participation doctrine," and the "public function test" (citations omitted)), the analysis seems to be controlled by the Supreme Court's decision in *West v. Atkins*, 487 U.S. 42 (1988). *See Rodriguez*, 577 F.3d at 824–28, *and Rice*, 675 F.3d at 670–73 (both applying *West*).

In *West*, a private physician who had a contract with local correctional centers was held to be a state actor. *West*, 487 U.S. at 44, 54–57. The Court held that the physician's function within the state system (rather than precise terms of employment) determines whether his actions can be fairly attributed to the state. *Id.* at 55–56. The dispositive issue concerned

> the relationship among the State, the physician, and the prisoner. Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights.

*Id.* at 56. The Seventh Circuit has noted that, while *West* used location of treatment as one factor supporting its conclusion, "nothing in [the *West*] analysis suggests that the result necessarily would have been different had the care been provided at a private facility." *Rice*, 675 F.3d at 672. The Court of Appeals has also looked to whether a medical provider has voluntarily assumed the responsibility of prisoner care as a factor in the state actor analysis. *Rodriguez*, 577 F.3d at 827 (a party's contract to exchange medical services for consideration is a strong indication of voluntary assumption of the state's care of its prisoners. A pre-existing obligation to provide emergency treatment to all persons is not). *See also Rice*, 675 F.3d at 672–73 (hinting *in*

6

*dicta* **that medical providers who remained free to reject an inmate's admission were state actors).**

Here, it is unclear whether Dr. Hurford—who emphasizes neither he nor Carle Physician's Group were under contract with the IDOC, and that he treated Wilkerson outside the prison—is a state actor for § 1983 purposes. A cursory reading of *West*, which lists contractual status and locale as factors in the analysis, supports Hurford's position. But as noted above, a contract is just one of the ways a party's voluntary assumption of prisoner care can be shown, and the analysis of the tri-lateral relationship among prisoner, State, and physician depends more on the physician's function than on the location of treatment. The record is silent as to just how Mr. Wilkerson came to be under Dr. Hurford's care in the first place. And the fact Hurford treated Wilkerson at least three times over a nine month span suggests a continuing relationship between the prison and the Carle Clinic. **See *Rodriguez*, 577 F.3d at 831 (hospital was state actor where the existence of a prison wing suggested an ongoing relationship between prison authorities and the hospital).** *West*'s analysis also flows from the proposition that an inmate "must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." **West, 487 U.S. at 54 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).** The plaintiff certainly relied upon Dr. Hurford for critical portions of his constitutionally-mandated and otherwise unavailable medical care.

In the end, however, it makes no difference. The Court can rule upon the instant motion without resolving Hurford's status, since the facts cannot support a finding that Hurford (even if he were a state actor) violated Wilkerson's Eighth Amendment rights. **See *Rice*, 675 F.3d at 673 (declining to hold whether a medical provider was a state actor when the lack of deliberate indifference was an independent source of decision).**

7

**2. No Deliberate Indifference**

Even assuming Hurford had been acting under the color of state law, his actions did not constitute an Eighth Amendment violation. The Eighth Amendment does not require that prisoners receive unqualified access to health care. **Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006).** Rather, inmates are entitled only to adequate medical care. **Boyce v. Moore, 314 F.3d 884, 888–89 (7th Cir. 2002).** Officials violate the Eighth Amendment's prohibition against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. **Greeno v. Daley, 414 F.3d 645, 652-53 (7th Cir. 2005) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). Accord Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 828 (7th Cir. 2009) ("Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution.").**

To prevail, a prisoner who brings a claim of constitutionally-deficient medical care must satisfy a two-part test. **Arnett, 658 F.3d 742, 750 (7th Cir. 2011) (citing Johnson v. Snyder, 444 F.3d 579, 584 (7th Cir. 2006)).** A prisoner satisfies the first, objective prong by showing he has an objectively serious medical condition. **Arnett, 658 F.3d at 750. Accord Greeno, 414 F.3d at 653.** The second prong—which takes account of a defendant's subjective state of mind—is whether a prison official acted with deliberate indifference to that medical condition. **Greeno, 414 F.3d at 652–53; Arnett, 658 F.3d at 750.** Hurford does not dispute the objective severity of the Wilkerson's spinal condition. He has ceded the objective prong, so whether he acted with deliberate indifference turns on the subjective prong.

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. **Greeno, 414 F.3d at 653.** The plaintiff need not show the physician literally ignored his complaint, just that the physician was aware of the serious medical condition and either knowingly or recklessly disregarded

8

it. **Hayes v. Snyder, 546 F.3d 516, 524 (7th Cir. 2008).** Courts give deference to physicians' treatment decisions, since "there is not one proper way to practice medicine, but rather a range of acceptable courses." **Jackson v. Kotter, 541 F.3d 688, 697–98 (7th Cir. 2008).** A doctor who chooses one routine medical procedure over another does not violate the Eighth Amendment. **McGowan v. Hulick, 612 F.3d 636, 641 (7th Cir. 2010). See also Estelle, 429 U.S. at 107 (whether additional diagnostic techniques or treatments were needed was a "classic example of a matter for medical judgment.").**

A prisoner is entitled only to reasonable measures to meet a substantial risk of serious harm—not to demand specific care or to receive the best care possible. **Forbes v. Edgar, 112 F.3d 262, 267 (7th Cir. 1997).** Neither negligent diagnosis nor negligent treatment is an Eighth Amendment violation: "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." **Estelle, 429 U.S. at 104.** The Eighth Amendment is not violated simply because an inmate is dissatisfied with his doctor's course of treatment. **See Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996) ("[T]he Constitution is not a medical code that mandates specific medical treatment.").** Deliberate indifference may be inferred from a doctor's treatment decision only when that decision is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [he] did not base the decision on such a judgment." **Gayton v. McCoy, 593 F.3d 610, 622–23 (7th Cir. 2010).**

Here, viewing the evidence in the light most favorable to Mr. Wilkerson, it is clear Dr. Hurford provided constitutionally adequate treatment for Wilkerson's back injuries. Wilkerson's arguments amount to little more than a disagreement with the decisions Hurford made in assessing his back injury. According to Hurford's affidavit, he saw Wilkerson only four times: in June 2008 for an initial consultation and surgery; in August 2008 for a follow-up visit; in November 2008 for another follow-up; and in late May 2009 for an exploratory surgery in which Hurford concluded no

9

additional reconstructive surgery was needed. (*See* Doc. 69-2, 2–7). According to his surgery notes, Wilkerson "judged that [Wilkerson] did not need any additional surgery" because "the patient was solidly fused." (Doc. 69-2, 24). In addition, Hurford acted as a consultant in February 2009, March 2009 and April 2009 when—at the request of prison medical officials—he gave his recommendations regarding Wilkerson's spine. (*Id.* at 6–7). Wilkerson's constitutional allegations are limited to the time after his November 2008 shower fall, a time in which Hurford made three requested recommendations (based on scans taken by Lawrence officials) and performed a surgery in which he—based on medical judgment—decided no further surgery was needed. Hurford's ability to treat Wilkerson as speedily as Wilkerson wanted may have been affected by Wilkerson's incarceration, but Hurford was not in charge of the pace of treatment, and his treatment of Wilkerson's spine is a far cry from the "unnecessary and wanton infliction of pain" required for an Eighth Amendment violation.

      The restricted amount of responsibility Hurford had for Wilkerson's care also militates in favor of summary judgment. According to his affidavit (and uncontroverted by Wilkerson), Hurford's role with respect to Wilkerson "was limited to providing [his] recommendations to [Wilkerson's] physicians at Lawrence Correctional Center and performing surgeries and follow-up care for the surgeries that were approved by" Lawrence officials. (Doc. 69-2, 5). As mentioned in the state-actor analysis above, Wilkerson was relying on Hurford only for brief (if important) stretches of the overall care he was owed as an inmate dependent on the state for his medical needs. In other words, if Hurford a state actor at all, he was only a state actor for very limited periods of time, and for very limited tasks. And he discharged his responsibilities in accord with Eighth Amendment norms—whether as a state actor or not.

      Wilkerson's more specific arguments fail to prevent summary judgment. Wilkerson claims Hurford could have easily admitted him to the hospital during his visits—but the facts show that

10

Hurford judged "[t]here was no indication to hospitalize" Wilkerson. That kind of medical decision is not violative of the Eighth Amendment. **See McGowan, 612 F.3d at 641.** Wilkerson argues that Hurford should have prescribed him pain medication. But Hurford swears (and Wilkerson provides no evidence to the contrary) he had no authority to either prescribe or give pain medication to Wilkerson (Doc. 69-2, 5). Indeed, there is no evidence on the record that Hurford even knew, from any source, including Wilkerson himself, that Wilkerson was no longer taking pain medication.

And while Wilkerson characterizes the delay between his shower accident and the May exploratory surgery as excessive, the evidence shows that Hurford had no responsibility for scheduling that surgery: each of his interactions with Wilkerson's medical treatment came at the request of Lawrence officials, or after Lawrence officials approved Wilkerson's surgery. (*See* Doc. 69-2, 6–8). When he was asked to treat Wilkerson, Hurford did. He was therefore not deliberately indifferent to Wilkerson's medical needs.

That leaves only the assertion—put forward in Wilkerson's complaint but unsupported by any documentation, affidavit, or any reasonable inference that could be drawn from the evidence—that Hurford knew Wilkerson had a "broken back" and deliberately ignored it. As discussed above, there is evidence aplenty that Hurford did not ignore Wilkerson's spinal issues. Wilkerson's assertion stands alone, without any definite, competent evidence to support it. It is not, therefore, sufficient for his claim against Hurford to survive summary judgment. **Serednyj, 656 F.3d at 547; Albeiro, 246 F.3d at 931–32.**

## CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Defendant Robert Hurford, Jr.'s Motion for Summary Judgment (**Doc. 69**) be **GRANTED**, that the District Judge adopt the above conclusions of law, and that Defendant Hurford be **DISMISSED** from the case **WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties may object to any or all of the proposed dispositive findings in this Recommendation. The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. *See, e.g., Snyder v. Nolen*, **380 F.3d 279, 284 (7th Cir. 2004).** **Objections to this Report and Recommendation must be filed on or before January 14, 2012**. *See* **FED. R. CIV. P. 6(d); SDIL-LR 5.1(c).** If the District Court accepts this Report and Recommendation, only Defendants Fenoglio and Benton will remain in the case.

**IT IS SO ORDERED.**

**DATE: 12/27/2012**                     /s/ *Stephen C. Williams*
                                         **STEPHEN C. WILLIAMS**
                                         United States Magistrate Judge